IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FORT SILL APACHE INDUSTRIES,  )
                               )
        Plaintiff,             )
                               )
    v.                         )        1:10cv1422 (LMB/TRJ)
                               )
DEBORAH EVANS MOTT, et al.,    )
                               )
        Defendants.            )

MEMORANDUM OPINION

In this civil action, which has been fully tried to the
bench, plaintiff Fort Sill Apache Industries ("FSAI") seeks to
recover compensatory and punitive damages[1] from defendant Deborah
Evans Mott ("Mott") based on claims of Conversion (Count I),
Breach of Fiduciary Duty (Count II), Deceit by False
Representation (Count III), Deceit by Nondisclosure and
Concealment (Count IV), Actual Fraud (Count V), and Constructive
Fraud (Count VI). During the bench trial, defendant orally moved
for judgment as a matter of law under Fed. R. Civ. P. 52(c), on
the ground that all of plaintiff's tort claims against Mott in
her individual capacity are actually contractual disputes with

---

[1] The exact amount of plaintiff's damages claim is unclear from
both the Complaint [Dkt. No. 1] and the plaintiff's Proposed
Findings of Fact and Conclusions of Law [Dkt. No. 73].
Nevertheless, it appears that FSAI claims some portion of the
$463,967.00 that it paid to Team Systems International after July
9, 2009, approximately $72,000.00 in charges to a debit card, and
around $220,000.00 in business development fees, for a maximum of
$755,967.00 in damages. See Compl. ¶¶ 57, 63, 73-80.

Mott's employer, Team Systems International, Inc. ("TSI"),[2] over the amounts billed for services performed pursuant to several contracts between the two corporate entities. Citing well-established Virginia case law, Mott argues that all of FSAI's claims against her fail and that judgment should be entered in her favor. FSAI contends in response that Mott personally took on fiduciary duties and other responsibilities for which she is individually liable by acting as FSAI's Chief Financial Officer ("CFO") and by virtue of her level of access to one of FSAI's bank accounts, including the use of a debit card linked to that account. FSAI also orally moved for inferences adverse to defendant because of alleged spoliation of evidence. The Court took both motions under advisement and in the weeks following the bench trial, the parties fully briefed these motions. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law supporting the decision to grant defendant's motion and deny plaintiff's motion as moot.

---

[2] Although this civil action was originally brought against both Mott and TSI, FSAI's claims against TSI were dismissed on March 7, 2011, because the Court found that they were barred by <u>res judicata</u>, except through arbitration proceedings, which had been explicitly reserved. <u>See</u> Order of March 7, 2011 [Dkt. No. 27]; Mot. Hr'g Tr. [Dkt. No. 28], at 3:19-4:4.

## I.  FACTUAL FINDINGS

### A. The Parties and the Court's Jurisdiction

FSAI is a corporation wholly owned by and organized under the tribal ordinances of the Fort Sill Apache Indian Tribe located in Fort Sill, Oklahoma.  FSAI is a government contracting business that specializes in construction projects.  During the relevant time period, FSAI was certified as an 8(a) small business by the United States Small Business Administration ("SBA").  See Plaintiff's Exhibit ("PX") 7, at FSAI003299; PX 10, at FSAI001280; Trial Tr. [Dkt. Nos. 81, 82] at 25:1-16.

Don Wauahdooah ("Wauahdooah") was hired in 2003 to be the administrator for the Fort Sill Apache tribe.  See Trial Tr. at 32:13-14, 490:20-22.  He became FSAI's president in 2004, but resigned from that position in November 2007.[3]  See id. at 490:20-491:7.  After Wauahdooah resigned, Jeff Haozous ("Haozous"),[4] who had for many years been the Chairman of FSAI's Board, served as the interim President until September 2009.  Id. at 27:14-20.  After Haozous left the position, Kevin Downs became the President of FSAI.  See PX 182.

---

[3] FSAI terminated Wauahdooah's employment earlier in 2007, but reinstated him shortly afterward.  It was from this reinstatement that he resigned in November 2007.  See Trial Tr. at 31:20-32:10.

[4] Haozous is sometimes referred to as Jeff Houser.  See Trial Tr. at 12:9-14.

TSI is a consulting service firm that specializes in government contracting. Trial Tr. at 279:19-24. It is organized under Delaware law as a limited liability company, and its principal place of business is in Reston, Virginia. Id. at 284:9-11. Since 2005, TSI has had either five or six members, including both Mott and her son, Christopher Mott, and a management committee made up of three of its members. Id. at 284:12-285:5, 444:8-10. Mott resides in Haymarket, Virginia, and at all times relevant to this litigation was a principal and employee of TSI. Id. at 278:24-279:1. This matter is before the Court under its diversity jurisdiction because FSAI and Mott are not citizens of the same state and more than $75,000.00 is at issue. See 28 U.S.C. § 1332.

## B. The Engagement Agreement

In 2005, FSAI was at risk of losing a contract it had obtained from the United States Navy because it lacked the financial expertise and accounting certifications required to properly fulfill that contract. TSI had the needed financial expertise, including experience with the Deltek[5] accounting system, and the requisite Defense Contract Audit Agency ("DCAA")

---

[5] Deltek offers accounting systems that meet the United States government's requirements for software that can be used to conduct accounting for federal government contracts. See Trial Tr. at 174:18-24. These requirements prohibit, for example, the manipulation or deletion of records that have been entered into the system. Id. at 175:3-11.

certification for handling government contracts involving up to $250 million. Wauahdooah contacted TSI for two reasons: (1) to save FSAI's Navy contract and (2) to obtain new government contracts. See Trial Tr. at 33:6-17, 280:15-281:14, 415:1-20, 493:17-495:24, 503:13-504:46; PX 2 (e-mails from 2005). As a result of his discussions with TSI, in August 2005, FSAI and TSI entered into an Engagement Agreement, which provided that FSAI would pay TSI to provide financial accounting, advising, and business development services.[6] Wauahdooah signed the Engagement Agreement on behalf of FSAI and Mott signed on behalf of TSI. See PX 4 (Engagement Agreement); Trial Tr. at 282:25-283:3, 284:6-8.

In June 2007, the Department of the Army awarded FSAI a contract for construction work on the first phase of a planned two-phase upgrade to the physical training grounds at Fort Lee, Virginia. FSAI and TSI then executed a Subcontract Agreement dated July 1, 2007, under which TSI would provide accounting and financial management services to FSAI for that project in exchange for the lump sum base bid price of $250,000.00. The subcontract did not authorize TSI to recoup any expenses

---

[6] The Engagement Agreement uses the term "project development," see PX 4, App'x I, at TSI (14 Sept 2012) 000996; however, it is unrebutted in the record that "project development" and "business development" are interchangeable terms for the same service. See Trial Tr. at 282:14-24, 285:11-24.

associated with the Fort Lee project.  See Defendant's Exhibit ("DX") 2.  Wauahdooah signed the subcontract on behalf of FSAI and Mott signed on behalf of TSI.  Id. at 8.  FSAI hired Advanced Constructive Services ("ACS") as a subcontractor for the Fort Lee project.  Trial Tr. at 236:16-18.

In October 2007, FSAI was awarded the prime contract for construction work on the second phase of the Fort Lee project. As a result, FSAI and TSI executed a second Subcontract Agreement, under which TSI would continue to provide direct subcontractor services on the second phase of the Fort Lee project for the lump sum base bid price of $900,000.00.  Again, Wauahdooah signed on behalf of FSAI and Mott signed on behalf of TSI, and the subcontract did not authorize TSI to recoup expenses associated with this second phase of the Fort Lee Project.  See DX 3; Trial Tr. at 290:18-291:12.

TSI subcontracted to Kreidler and Associates ("K&A") certain of TSI's obligations under both the Engagement Agreement and the Fort Lee subcontracts, specifically the accounting functions and the maintenance of the Deltek accounting system.  See Trial Tr. at 285:11-18, 286:8-14.  K&A is a company operated almost exclusively by Bonnie Kreidler ("Kreidler").  Bledsoe & Associates, PLLC, the firm of Danny Lee Bledsoe ("Bledsoe"), a self-employed CPA, conducted FSAI's financial audits for the

fiscal years ending September 30, 2007, and September 30, 2008. See PX 112; PX 153; Trial Tr. at 148:9-13, 149:4-11.

## C. **The Operating Account and Debit Card**

At some point in 2005 or early 2006, FSAI was experiencing difficulties obtaining the necessary performance bonds for one of its construction projects. Trial Tr. at 297:17-21, 507:24-508:10. Although there is some conflict between Mott's and Wauahdooah's testimony as to who put together a list of banks that would be able to handle the performance bonds,[7] it is undisputed that Wauahdooah, not Mott, selected Bank of America from that list. See id. at 298:2-299:5, 309:7-18, 509:5-7. Accordingly, on January 31, 2006, the FSAI Board passed resolutions to open a bank account at Bank of America (the "Operating Account"), PX 12, and to fund it with $150,000.00, PX 10. See also Trial Tr. at 47:18-49:16.

The Board appointed as signatories to the Operating Account "Don Wauahdooah, President of FSAI and Deborah Mott," who was

---

[7] Specifically, both Mott and Wauahdooah claimed responsibility for creating the list based on bonding requirements. Mott testified that when she contacted a surety bond firm with which she regularly worked, the firm "made it clear that they would only deal with an entity" using a bank listed on Treasury Circular 94, and that she gave Wauahdooah the list of banks on that Circular. See Trial Tr. at 297:22-299:5. Wauahdooah testified that he knew FSAI would have to use a bank that had an asset basis of approximately $3 billion to obtain the proper bonds, and that he looked up the list of banks himself. Id. at 507:24-508:25.

described as "CFO, TSI," and authorized both of them "to receive funds, transfer funds, write checks, establish payroll account, receive banking information of the account, and manage all funds." PX 12; see also Trial Tr. at 49:20-22, 299:6-11, 309:19-23, 310:8-16. Mott's unrebutted testimony was that it was at Wauahdooah's request that she was added as a signatory to the Operating Account. Specifically, she testified that Wauahdooah had "requested that TSI provide a billing professional to be a signator [sic] on the billing account." Trial Tr. at 300:1-6. Although TSI was responsible for administering the Operating Account, it subcontracted the bookkeeping for that account to K&A. Id. at 309:23-310:6.

To allow more convenient reimbursement for travel and other expenses incurred under the Engagement Agreement and the Fort Lee subcontracts, Wauahdooah authorized the issuance of two debit cards linked to the Operating Account; one debit card was issued to him and the other was issued to Mott. Id. at 319:9-320:4, 510:6-511:4. Although Mott and Wauahdooah did not discuss what specific charges could be made to the debit card, both testified that they understood that the cards should be used to pay "[u]sual and customary business expenses," such as "travel, business lunches or business meals," or to purchase materials for the Fort Lee job site. Id. at 320:5-321:1; 511:10-512:14.

Charges on the debit card were immediately deducted from the Operating Account. Mott turned over all receipts to Kreidler because K&A was responsible for maintaining the books and records for that account. See id. at 321:2-8; 441:7-18. Kreidler did not send those receipts to FSAI. Id. at 474:11-15. Although Mott never directed Kreidler to send FSAI a monthly statement of the expenses charged on the debit card, she testified that she did direct Kreidler to send such statements when Wauahdooah requested them. Id. at 388:9-390:12.

The bank statements for the Operating Account were not sent to FSAI's Oklahoma address, but were sent to the same address as TSI's office in Reston, Virginia. See PX 330-336; Trial Tr. at 411:2-9. They eventually came into the possession of Kreidler, who on a monthly basis either mailed or gave the paper statements to Mott; Kreidler did not send the statements to FSAI. Trial Tr. at 473:8-474:5. The accountants performing FSAI's annual audits requested the bank statements from Mott. Id. at 164:3-13, 323:6-17. There is no evidence in the record that Mott ever failed to turn over those records to the accountants.

Wauahdooah resigned in November 2007. No changes were made to the authority over the Operating Account. Accordingly, Mott became the sole signatory for the Operating Account and the only holder of a debit card until September 2009. See PX 180.

### D. **Mott's Role at FSAI**

The key issue in this litigation is whether Mott is personally liable to the plaintiff for any of its alleged damages. Mott argues that throughout her work on behalf of the plaintiff she was employed by TSI, not by FSAI, and that all of her work was performed pursuant to contractual agreements between FSAI and TSI; accordingly, Mott concludes that plaintiff's claims can be brought only against TSI. See id. at 19:22-21:8. Plaintiff argues that Mott became personally liable when she acted as FSAI's CFO, and as such owed fiduciary duties to FSAI. See id. at 9:8-19, 590:17-24. The evidence supports Mott's argument.

All directors of FSAI must be members of the Fort Sill Apache tribe, but tribal membership is not required for FSAI's officers. Id. at 50:8-14. Although FSAI could have hired Mott to be an officer of FSAI, the evidence clearly establishes that she was never hired by FSAI. There is, for example, no evidence in the record that Mott was paid directly by FSAI, and there are no written or oral contracts or agreements between FSAI and Mott in her personal capacity. See id. at 120:3-16, 138:9-139:7, 290:11-15, 322:15-22, 498:16-22, 550:24-551:1.

It is undisputed, and the Court finds, that Mott did perform some of the duties that a corporation would ordinarily entrust to a CFO. See, e.g., id. at 50:19-23; 541:10-15. For example, she

hired[8] Bledsoe & Associates to perform the financial audit for
the fiscal years ending on September 30, 2007, and September 30,
2008, and she sent Bledsoe the financial information necessary to
perform those audits.  See id. at 149:6-11, 150:22-151:1, 152:23-
153:13, 323:8-17; PX 112; PX 143; PX 151; PX 153; PX 365.
Additionally, Bledsoe testified that he asked Mott for this
information because he understood that "they maintained the books
of record" for FSAI and would be able to provide the information
regarding all of FSAI's bank accounts.  Trial Tr. at 153:20-154:7
(emphasis added).

     Contrary to plaintiff's allegations that Mott asked for CFO
authority, there is no evidence in the record indicating or even
suggesting that Mott asked to take on the duties of CFO.  In
fact, the unambiguous evidence establishes that it was Wauahdooah
who suggested and authorized Mott to hold herself out to third
parties as the CFO of FSAI to "get access to information that she
normally wouldn't be able to get being that she was not an
officer of the company and she had no connection to Fort Sill
Apache Industries other than an agreement."  Id. at 499:2-7.
This authorization was made explicit on August 8, 2007, when

_____

[8] Mott, with Haozous' explicit authorization, signed Bledsoe's
representation documents as "Deborah Evans Mott for FSAI," and
wrote that her title was "CFO" or "Chief Financial Officer, Fort
Sill Apache Industries."  See PX 108; PX 112, at BD000451; PX
153, at BD000455; Trial Tr. at 150:12-21.

Wauahdooah wrote a letter to the SBA informing them that Mott "is the Chief Financial Officer for Fort Sill Apache Industries and authorized to conduct business with all federal agencies." PX 41; see also Trial Tr. at 321:22-322:14, 499:8-11; PX 28 (e-mail chain between Mott and SBA). According to Wauahdooah, although limitations on the scope of Mott's authority as CFO were not explicitly defined, it was "specifically understood" that her authorization to use that title "was strictly for federal contracting and nothing else" and had "no connection to being an officer of the tribe or officer of the organization." Trial Tr. at 500:5-9.

Almost all of the examples in the record of Mott signing as CFO of FSAI reflect this understanding because they involve representations to third parties in circumstances related to government contracts. See, e.g., PX 7 at FSAI003296 (presentation to the Fort Riley ACOE); PX 14, 16, 20 (Bank of America signature cards and authorizations); PX 27 (proposal sent to USA Engineer District, Norfolk); PX 28 (e-mail chain between Mott and SBA concerning her ability to bind the firm); PX 112, 135 (auditor certification letters).[9] Moreover, after Haozous took over Wauahdooah's position, he also explicitly authorized

---

[9] In at least one instance Mott indicated that she was an employee of TSI even as she also indicated that she was acting as the CFO of FSAI. See PX 7 at FSAI00300 (presentation to the Fort Riley ACOE).

Mott to sign the certification letters sent to the auditors on behalf of FSAI. See PX 108 at FSAI001751 (September 8, 2008 e-mail from Haozous granting permission for Mott to sign the management representation letter sent to the auditors).

Throughout the relevant time period, FSAI was on notice that Mott was an employee of TSI, and neither an officer nor an employee of FSAI. Most importantly, Wauahdooah sent a memorandum to the FSAI Board of Directors on September 15, 2007, pointing out that FSAI was "contracting almost all of [its] internal requirements to outside companies" and that "[a]ll of [its] contracted service providers have business interest [sic] of their own and any long term commitment to the best interest of FSAI comes after the business interest [sic] of their own are satisfied." DX 4 at FSAI002937. He further observed that his concern was "especially true in the Finance Accounting area" because "[c]urrently TSI ( Debbie [sic] Mott) has been providing all the finance and payroll functions for FSAI," and requested that "the Board of Directors consider and approve the process of hiring additional staff for FSAI," including an in-house "Chief Financial Officer." Id. Wauahdooah testified that he sent this memorandum to the Board of Directors to generate a discussion of FSAI's "need to have folks in place in order to be able to carry on once we did not have an association with TSI" or to find another entity that could provide the services FSAI was obligated

13

to provide under the contracts it had obtained. Trial Tr. at 502:4-13. Haozous recalled receiving the memorandum, but "took no action." His explanation for the inaction was that "there [were] no specifics." Id. at 73:13-76:11, 125:15-126:4.

In addition, Haozous testified that when he asked Mott about a new opportunity, he asked: "Well, what is your company going to receive?" Trial Tr. at 223:23-24. Every e-mail in the record from Mott was sent from her TSI e-mail address, and she never had or used any FSAI e-mail address. Moreover, all FSAI payments for Mott's work were made to TSI, not to Mott personally, with records showing that FSAI paid TSI $100.00 per hour for Mott's time pursuing these "CFO" services pursuant to the Engagement Agreement between FSAI and TSI. See PX 243 (check register showing that all monies were paid to TSI); PX 8 (e-mail discussing billing rate of $100.00 per hour for "CFO" and $185.00 per hour for "B&P"); Trial Tr. at 414:7-12; see also PX 4 at TSI (14 Sept 2012) 000990, 996 (providing that FSAI would pay TSI "[a] cost plus fee of $100 per hour for monthly Controller financial accounting services and $185.00 per hour for all other services"). These facts establish that FSAI knew that its relationship with Mott existed solely as a result of its contractual agreement with TSI, and that Mott had no independent, personal relationship with FSAI.

Plaintiff contests this conclusion by arguing that Mott "was the human being who was managing and directing the financial matters for Industries." See id. at 9:16-19. That argument misses the key point, which is that all those activities arose out of the Engagement Agreement between FSAI and TSI. Finally, even if there were sufficient evidence to find Mott individually liable, plaintiff has not produced sufficient evidence to establish by a preponderance of the evidence that Mott converted any of plaintiff's funds, breached any fiduciary duty, or engaged in any concealment or fraudulent activities.

**E. Termination of the Relationship between FSAI and TSI**

In 2009, FSAI became concerned that it was receiving a lower profit margin for Phase 2 of the Fort Lee project than it had received for Phase 1. Id. at 85:11-19. On September 8, 2009, the Board passed a resolution that removed both Don Wauahdooah and Deborah Mott as signatories for the Operating Account and authorized Haozous, Kevin Downs, and several other officers and directors of FSAI to "sign checks and to approve the transfer of funds" from the Operating Account. PX 180. The resolution also changed the mailing address associated with the Operating Account to the tribe's mailing address, and required the approval of two authorized check signers for all payments or transfers of funds from the Operating Account. See id.

As a result of the Board's actions, TSI terminated the Engagement Agreement and its remaining Fort Lee subcontract agreement through two letters dated September 25, 2009, from TSI's attorney, John Dowd, to the FSAI attorney, Robert Prince. See DX 34 at FSAI002942; Trial Tr. at 379:10-17. According to Mott, when she was removed from the Operating Account, TSI lost the ability to check the bank records to see which subcontractors had been paid. Because TSI was therefore no longer able to certify to the federal government that all subcontractors had been paid, as it was required to do for the Fort Lee project invoices, TSI terminated its relationship with FSAI. Trial Tr. at 380:21-381:15. In response to a representation from Haozous that TSI was being uncooperative by not informing FSAI about which checks had cleared, TSI's attorney sent a third letter to FSAI explaining that TSI could not provide that information because TSI no longer had access to the Operating Account. See id. at 381:17-23; DX 34 at FSAI002945.

On September 29, 2009, the FSAI Board passed a resolution requiring Mott to turn over several documents and information related to FSAI's finances and contracts to an individual in Annandale, Virginia. PX 192. To effectuate this resolution, Kevin Downs sent the resolution and a letter dated October 5, 2009, to Mott through fax and certified mail. The letter "directed and required" Mott "to preserve all documents,

16

information, and platforms, electronic or otherwise, that may be discoverable in any future litigation arising from [her] relationship with FSAI." PX 201. The letter further directed that she notify all "subcontractors, vendors, agents," and similar individuals "and instruct them to preserve all forms of relevant information for the duration of the controversy." Id.

Mott testified that she never received this letter and the attached resolution. Trial Tr. at 407:12-17. Plaintiff did not present any certified mail receipt to rebut Mott's testimony. Mott admitted that she did not send the requested documents and that she had refused to grant FSAI access to the Deltek accounting system. Id. at 107:10-20. Mott testified that she made these decisions on the advice of counsel. Id. at 373:13-18.

On October 23, 2009, FSAI sued TSI and Mott in her individual capacity, seeking an order requiring them to produce the documents FSAI requested in its September 29, 2009 resolution. See DX 23; see also generally Fort Sill Apache Indus., LLC v. Mott, No. 1:09cv1201 (E.D. Va. filed on Oct. 23, 2009). The parties ultimately settled that litigation after TSI produced several boxes of documents and transferred the Deltek system to FSAI. After that document production, the parties jointly filed a notice of dismissal with prejudice. See Trial Tr. [Dkt. Nos. 81, 82] at 172:19-22; DX 26, 27 (e-mailed negotiations); DX 28 (transmittal letter and inventory of

documents produced in settlement arrangement); DX 24 (notice of dismissal). The notice of dismissal explicitly reserved FSAI's "right to pursue additional claims against defendants in arbitration." DX 24.[10]

TSI has an e-mail retention policy in which unsaved e-mails are deleted off of the servers after 90 days. Trial Tr. at 405:8-406:24. Mott testified that she had saved e-mails relating to work on the Fort Lee projects and FSAI's business development before the litigation in 2009 was dismissed; however, after the litigation in 2009 was dismissed, and despite the explicit carve-out for arbitration in that dismissal, she "assumed that there was no more conflict about those issues" and thus allowed the e-mails to be deleted. Id. at 406:9-21. She saved specific other e-mails to support TSI's outstanding claim against FSAI for TSI's contingency fee. Id. at 405:25-406:8.

FSAI filed this civil action against Mott and TSI on December 20, 2010, approximately a year after the earlier litigation was dismissed. See Dkt. No. 1.[11] On March 7, 2011,

---

[10] Under the subcontracting agreements between FSAI and TSI, "[a]ll claims, disputes and other matters in question between [FSAI] and [TSI] arising out or relating to th[ese] subcontract[s] or the breach thereof shall be decided and settled by binding arbitration." DX 2 ¶ 23, at TSI (23 Aug 2012) 000012; DX 3 ¶ 23, at TSI (23 Aug 2012) 000025. There is no arbitration clause in the Engagement Agreement between FSAI and TSI.

[11] On March 19, 2012, FSAI filed a third civil action against TSI and also named ACS as a defendant, alleging breach of the Fort

18

FSAI's claims against TSI were dismissed because FSAI had dismissed with prejudice its claims in the 2009 litigation, reserving only its rights to proceed against the defendants in arbitration. See Dkt. No. 27; Mot. Hr'g Tr. [Dkt. No. 28] at 3:24-4:4.[12]

## II. LEGAL CONCLUSIONS

Plaintiff argues that the facts establish that Mott personally owed FSAI a fiduciary duty, which she breached on multiple occasions, that she converted plaintiff's funds by funneling payments to TSI for unauthorized work, and that she committed fraud and misrepresentation. See Trial Tr. at 8:7-10. Although plaintiff maintains that TSI "is not much more than herself [Mott] and some family members, maybe one or two others," id. at 8:22-24, it has neither argued that piercing the corporate veil is appropriate in this action, nor presented any evidence to support piercing the corporate veil.

---

Lee subcontracts. See Fort Sill Apache Indus. v. Team Sys. Int'l, LLC, No. 1:12cv305 (E.D. Va. filed on Mar. 19, 2012). Default judgment was entered against ACS, Dkt. No. 43, and the claims against TSI were held in abeyance pending the completion of the arbitration proceedings, Dkt. No. 33.

[12] Although the 2009 litigation also named Mott as a defendant in her individual capacity, Mott had not agreed as an individual to arbitrate with FSAI. See Mot. Hr'g Tr. at 4:5-12. Accordingly, Mott was not dismissed from the action, but FSAI's claims against her were stayed to allow the arbitration proceedings, which had been filed first, to move forward. See Dkt. No. 27. That stay was lifted on June 21, 2012 [Dkt. No. 30], and the claims against Mott were allowed to proceed to trial by the bench.

The defendant's primary argument, both at trial and in her Motion for Judgment under Fed. R. Civ. P. 52(c), is that "[a]ll of the agreements in this case run between Fort Sill Apache Industries and TSI." Id. at 16:1-2. Accordingly, she contends that "this case really is just a breach of contract case in sheep's clothing," id. at 21:6-8, and that there is no proper basis for a judgment against Mott individually, id. at 22:15-23.

## A. Defendant's Motion for Judgment on Partial Findings

Under the Federal Rules of Civil Procedure:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 52(c). Such a "judgment on partial findings is made after the court has heard all the evidence bearing on the crucial issue of fact." Fed. R. Civ. P. 52 Advisory Committee Notes (1991 Amendments). The court may, in its discretion, "decline to render any judgment until the close of the evidence." W.L. Gore & Assocs., Inc. v. Medtronic, Inc., 874 F. Supp. 2d 526, 540 (E.D. Va. 2012).

In considering a motion for judgment on partial findings, the court "must weigh and consider all of the evidence presented" and should not make any special inferences in considering the evidence in plaintiff's case. Cherrey v. Thompson Steel Co.,

20

Inc., 805 F. Supp. 1257, 1261 (D. Md. 1992). Instead, the court "is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies." Id. (quoting 9 C. Wright & A. Miller, Federal Practice and Procedure § 2371 (1971)) (internal quotation mark omitted). In short, "Rule 52(c) enables a court, acting as trier of fact, to dispose of an action when it is clear that [the] plaintiff[] ha[s] failed to prove [its] case." Fetcher v. Conn. Gen. Life Ins. Co., 800 F. Supp. 182, 196 (E.D. Pa. 1992).

Defendant argues that FSAI's tort claims all "spring from the Engagement Agreement and turn on a contractual interpretation of that agreement," and accordingly that FSAI's only legally cognizable basis for relief would be through a breach of contract claim against TSI. Mem. in Supp. of Def.'s Fed. R. Civ. P. 52(c) Mot. for J. ("Def.'s Mem.") at 2. FSAI contends that Mott breached duties she personally owed to FSAI that were independent of TSI's duties under the Engagement Agreement; specifically, duties not to defraud and not to convert property that are "owed by everyone to everyone," and fiduciary duties that arose "because she sought and personally was given" effectively unsupervised access to the Operating Account and "because she personally took on the role of Chief Financial Officer for FSAI." Pl.'s Post-Trial Reply Mem. in Opp'n to Def.'s Rule 52(c) Mot. ("Pl.'s Opp'n") at 1-2 (quoting Hewlette v. Hovis, 318 F. Supp.

2d 332, 337 (E.D. Va. 2004)). FSAI bolsters its argument by contending that Virginia law establishes that "tort claims are not barred by the presence of a contract unless the conduct expressly violates obligations specifically addressed in the contract." Id. at 2; see also Post-Trial Mem. of Pl. Fort Sill Apache Indus. in Supp. of Mot. for Spoliation Inferences and in Opp'n to Defs.' [sic] Rule 52(c) Mot. ("Pl.'s Mem.") at 40-44.

Under Virginia law, for "a single act or occurrence" to "support causes of action both for breach of contract and for breach of a duty arising in tort . . . the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract." Augusta Mut. Ins. Co. v. Mason, 645 S.E.2d 290, 293 (Va. 2007). FSAI is correct that the cases dismissing tort claims often involve breaches of specific contractual provisions. See, e.g., Augusta Mutual, 645 S.E.2d at 294 (describing specific provisions of the agreement that defendant violated); Richmond Metro. Auth. v. McDevitt Street Bovis, Inc., 507 S.E.2d 344, 347 (Va. 1998) (agreeing that each misrepresentation was "related to a duty or an obligation that was specifically required" by the contract).

The key to deciding "whether a cause of action sounds in contract or tort," however, is not whether a specific provision of the contract has been breached but "the source of the duty violated." Richmond, 507 S.E.2d at 347. Whether a duty is

22

created specifically by contract or generally by contract is of no moment; if the contract creates the duty, then the action sounds in contract and cannot be brought in tort. See id.

The cases cited by plaintiff are not to the contrary. For example, in Three Rivers Landing of Gulfport, LP v. Three Rivers Landing, LLC, HG, the court distinguished Augusta Mutual because "the Former General Partner did not violate an express contractual provision and the Plaintiffs' claim sounds in tort." No. 7:11cv25, 2012 WL 1598130, at *4. In that case, however, there was no dispute that the defendant was a former general partner, and "[f]iduciary duties owed by one partner to other partners are common law duties and thus independent from duties that may be imposed under the Partnership Agreement." Id. Similarly, in PGI, Inc. v. Rathe Productions, Inc., the Virginia Supreme Court held that there was sufficient evidence for a jury to find an implied contract between the parties for a joint venture, and accordingly "[t]o the extent that this implied agreement does not address an issue, the law of partnership is applied." 576 S.E.2d 438, 442 (Va. 2002). No similar relationship existed between FSAI and Mott personally.

This distinction is significant because the Engagement Agreement between FSAI and TSI did not provide for specific duties, but was a general agreement that in exchange for compensation, TSI would provide a broad array of accounting and

finance services and would also work on project or business development. See Trial Tr. at 313:19-314:4; PX 4 at TSI (14 Sept 2012) 000986-87 (providing that FSAI "desires to engage the CONSULTANT [TSI] to conduct financial accounting and advisory services for the Client's [FSAI's] sole and primary books and records" and further providing for additional services). This understanding of the agreement is supported by the absence of a definition for the referenced "Project," see PX 4 at TSI (14 Sept 2012) 000986, 996; as Wauahdooah testified, both signatories understood that the Project "would become whatever we were associated with at, at any particular time frame." Trial Tr. at 498:8-15.

Plaintiff attempts to distance this litigation from the Engagement Agreement by arguing that the Engagement Agreement did not create specific duties regarding an Operating Account or a debit card. This argument is not persuasive because the contract created general duties encompassing those activities. Any specific duties regarding the Operating Account or the debit card arose out of the general duties that TSI owed FSAI: the duty to provide financial accounting and advising services "in a good and professional manner," and the duty to work for FSAI in pursuing new projects in good faith. See PX 4 at TSI (14 Sept 2012) 000986-87.

Additionally, many of the disputes in this litigation have in fact centered on specific provisions of the Engagement Agreement. For example, the parties vigorously contested whether the Engagement Agreement entitled TSI to be paid for the time and expenses Mott incurred pursuing new business opportunities for FSAI, or whether it entitled TSI to be paid only on a contingency fee basis. The parties also disputed whether certain projects were authorized by FSAI, as required by the Engagement Agreement. See PX 4 at TSI (14 Sept 2012) 000986 ("If authorized in writing by the CLIENT [FSAI], the CONSULTANT [TSI] shall furnish or obtain from others Additional Services . . . ."). Similarly, plaintiff emphasized the Engagement Agreement's provision requiring TSI to submit monthly invoices for approval before it could be paid, and the parties vigorously disputed whether such invoices were in fact submitted and authorized. See Trial Tr. at 383:11-389:8.

Accordingly, the Court finds that the factual disputes at issue center on whether the Engagement Agreement was breached. Because Mott signed that Engagement Agreement on behalf of TSI, any tort claim arising out of misconduct under the Engagement Agreement must be brought against TSI, not Mott. Whether TSI in any respect breached the Engagement Agreement is an issue to be decided in another forum.

1. <u>Breach of Fiduciary Duty (Count II)</u>

FSAI argues that it showed at trial "that it trusted Ms. Mott, not TSI, with personal control over and access to FSAI's Bank of America operating account," and that Mott "sought and personally was given access to FSAI's bank account, was personally trusted with effectively unsupervised control of transfers from the account, [] was personally the signatory on the account, not TSI," and she "personally took on the role of Chief Financial Officer for FSAI." Pl.'s Opp'n at 8. This argument fails because it is not supported by the evidence.

First, and most conclusively, Wauahdooah unambiguously advised the FSAI Board of Directors that Mott was providing all of FSAI's finance and payroll functions as a contracted service provider pursuant to the Engagement Agreement between FSAI and TSI and that any obligations she owed to FSAI were secondary to her duties to her employer, TSI. See DX 4.

Second, there is no evidence that Mott sought access to the Operating Account or asked for a debit card. Instead, the unrebutted testimony is that the President of FSAI, Wauahdooah, made both of those suggestions to facilitate Mott's ability to carry out TSI's duties under the Engagement Agreement. See <u>supra</u> section I.D. Similarly, the unrebutted evidence is that Wauahdooah suggested that Mott represent herself as the CFO of FSAI, again to facilitate her ability to carry out TSI's duties

under the Engagement Agreement.  See id.  Plaintiff argues that
one can infer Mott's motivations with respect to the Operating
Account from TSI's decision to cancel its contracts with FSAI
after Mott was removed as a signatory.  See Pl.'s Opp'n at 10-11.
No inference can be drawn from that action.

Finally, in the Resolution authorizing the opening of the
Operating Account, FSAI did not vest its trust in Mott
personally, but explicitly authorized "Don Wauahdooah, President
of FSAI and Deborah Mott, CFO, TSI" to "receive funds, transfer
funds, write checks, establish payroll account, receive banking
information of the account, and manage all funds held by the Bank
of America FSAI account."  PX 12 at FSAI002584 (emphasis added).
Although Mott signed the Bank of America forms as CFO without any
reference to TSI, see PX 14, 16, 20, FSAI's internal documents
demonstrate its understanding that she was acting as an agent of
TSI.  This evidence is therefore consistent with the Court's
finding that FSAI was aware that Mott worked for them as an agent
of TSI, even though FSAI explicitly authorized Mott to represent
herself to third parties as FSAI's CFO.

Given this evidence, a fiduciary relationship between FSAI
and Mott in her personal capacity did not arise out of the
Board's decision to ignore Wauahdooah's concerns.  See Trial Tr.
at 73:13-76:11, 125:15-126:4 (Haozous testifying that he recalled
receiving Wauahdooah's memorandum but took no action).  Moreover,

27

after Wauahdooah resigned from FSAI, FSAI simply neglected to change anything that Wauahdooah had authorized. Although this failure to act led to a remarkable absence of FSAI oversight over its own finances, it did not create independent fiduciary duties between FSAI and Mott in her personal capacity.

Because Mott would have owed FSAI no fiduciary duty but for the existence of the Engagement Agreement, "the fact that those duties arose by implication does not automatically mean that they are common law duties for which recovery may be sought in tort." Bocek v. JGA Assocs., No. 1:11cv546, 2012 WL 1161469, at *5 (E.D. Va. Apr. 5, 2012). Accordingly, FSAI fails to establish a claim against Mott in her individual capacity for breach of any fiduciary duty.

### 2. Conversion (Count I)

Under Virginia law, "the tort of conversion encompasses any wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession; [and any] act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." PGI, Inc. v. Rathe Prods., Inc., 576 S.E.2d 438, 443 (Va. 2003) (quoting United Leasing Corp. v. Thrift Ins. Corp., 440 S.E.2d 902, 905 (Va. 1994)) (internal quotation marks omitted) (omission and alteration in original). FSAI argues that Mott converted its property, specifically the money held in the Operating Account,

by using the debit card for personal purposes and by "diverting FSAI funds" to TSI, "the company in which she held a majority interest." Pl.'s Opp'n at 47. It further argues that the Engagement Agreement has no relevance to this claim because "Mott's access to FSAI's funds, and her responsibilities with respect to FSAI's bank accounts and funds, is unmentioned in the contract." Id.

For Mott's actions to constitute conversion, they must have been "wrongful." The evidence unambiguously establishes that FSAI authorized "Deborah Mott, CFO, TSI" to "receive funds, transfer funds, write checks, establish payroll account, receive banking information of the account, and manage all funds held by" the Operating Account. PX 12. Mott's transfers of Operating Account funds are thus wrongful only if they were not authorized.

Although the Engagement Agreement does not specify that either a debit card or any bank accounts would be set up to pay TSI for its work, it does provide that FSAI would pay TSI for services provided and reimbursable expenses. See PX 4 at TSI (14 Sept 2012) 000990 ("CONSULTANT [TSI] shall submit statements for Basic and Additional Services rendered and for all Reimbursable Expenses incurred on a monthly basis. . . . CLIENT [FSAI] shall make prompt payments in response to CONSULTANT'S statements."). Therefore, any dispute about whether a particular withdrawal of funds to pay an expense or TSI invoice reduces to a dispute over

what services TSI performed and charged for payment. As such, they all center on whether TSI breached the Engagement Agreement and cannot stand independently against Mott.

### 3. Deceit and Fraud (Counts III, IV, V, VI)

Similarly, any misrepresentations that Mott may have made to FSAI concerning TSI's duties and the associated expenses incurred under the Engagement Agreement are actually claims that the Engagement Agreement was breached by TSI. See Pl.'s Mem. at 47-48 (arguing that Mott misrepresented the amounts FSAI owed TSI for her business development efforts).

Plaintiff argues that its fraud and deceit claims should survive defendant's motion because Mott's misrepresentations were false when made. See Pl.'s Mem. at 48 (citing Vanguard Military Equip. Corp. v. David B. Finestone Co., Inc., 6. F. Supp. 2d 488, 493 (E.D. Va. 1997)). This argument is unavailing. The Virginia Supreme Court held in Richmond Metropolitan Authority v. McDevitt Street Bovis, Inc. that the defendant's "false applications under oath to induce payments" did "not give rise to a cause of action for actual fraud" because "each particular misrepresentation made by [defendant] related to a duty or an obligation that was specifically required by the" contract. 507 S.E.2d at 346-47. Similarly, even if Mott's statements regarding the amounts FSAI owed TSI were false when made, that would render TSI in breach of the Engagement Agreement's requirement that it submit statements

"based on the CONSULTANT'S [TSI's] hourly billable time and expense record." PX 4 at TSI (14 Sept 2012) 000990.

"Misrepresentations concerning a duty owed solely by virtue of a contract are not independently actionable as fraud." Mendoza v. Cederquist, No. 1:09cv163, 2009 WL 1254669, at *5 (E.D. Va. May 6, 2009). Because any misrepresentations made by Mott concerned only contractual duties owed by TSI to FSAI, plaintiff's claims for deceit and fraud fail.

## B. **Plaintiff's Motion for Spoliation Inferences**

During trial, plaintiff moved for adverse inferences against Mott as sanctions for spoliation of evidence. See Trial Tr. at 572:13-576:4, 578:11-22. Specifically, plaintiff asks this Court to adopt unrebuttable inferences that (1) monthly TSI invoices that Mott testified she created did not contemporaneously exist, (2) such invoices were neither sent to nor approved by FSAI, (3) there was no contemporaneous documentation substantiating the amounts charged in those invoices or documenting the business purposes for the debit card charges, and (4) Mott's decision to let the e-mail retention policy run its course and delete her e-mails "reflects her intent to violate her fiduciary duties." See Mot. of Pl. Fort Sill Apache Industries for Spoliation Inferences [Dkt. No. 85].

Although the lack of these invoices is a problem, Wauahdooah's testimony supported Mott's claim that the monthly

invoices she sent to FSAI were regularly approved. See Trial Tr. at 493:9-15, 515:1-13 (testifying that he approved every TSI invoice he received as President of FSAI and never refused to pay any TSI invoices). Additionally, the record includes one invoice, dated August 3, 2006, which was marked "OK for Payment" and signed by Wauahdooah. See DX 62, at TSI (23 Aug 2012) 000600-01. This invoice provides some support for Mott and Wauahdooah's testimony. Most importantly, even if the Court drew spoliation inferences against Mott, it would be irrelevant to the outcome of this litigation, given the Court's conclusion that Mott personally owed no duties to FSAI. Accordingly, the Court need not reach this issue and plaintiff's Motion for Spoliation Inferences will be denied as moot.

III.  CONCLUSION

For the reasons stated above, defendant's Motion for Judgment [Dkt. No. 83] will be GRANTED, plaintiff's Motion for Spoliation Inferences [Dkt. No. 85] will be DENIED AS MOOT, and judgment will be entered in favor of the defendant by an Order to be issued with this Memorandum Opinion.

Entered this  1st  day of August, 2013.

Alexandria, Virginia

                                                    /s/
                                             Leonie M. Brinkema
                                             United States District Judge

32